UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————x

UNITED STATES OF AMERICA,

  -against-                                                              06 Cr. 718 (CM)

HURGENES PIGNARD,

        Defendant.

————————————————————x

DECISION DENYING DEFENDANT'S MOTION TO SUPPRESS WITHOUT A HEARING

The indictment before the Court charges defendant with attempted bank robbery and firearms charges. Count One charges the defendant with engaging in a conspiracy from February 2005 through April 2005 to commit bank robbery and armed bank robbery, in violation of Title 18, United States Code, Section 371. Count Two charges the defendant with the February 3, 2005 attempted armed bank robbery of the Charter One Bank in Spring Valley, New York, in violation of Title 18, United States Code, Section 2113(a) & (d). Count Three charges the defendant with the April 20, 2005 attempted bank robbery of the First National Bank of Jeffersonville in Loch Sheldrake, New York, in violation of Title 18, United States Code, Section 2113(a). Count Four charges the defendant with possessing a firearm in furtherance of the April 20, 2005 attempted bank robbery, in violation of Title 18, United States Code, Section 924(c)(1)(A)(i).

Pignard moves to suppress the evidence recovered from the August 24, 2006 search of his apartment on the ground that the supporting allegations in the search warrant failed to establish probable cause to search his home for evidence of drug dealing. In the alternative, he moves to suppress certain evidence recovered during the search of his apartment "that fall outside the scope

of the warrant." (D. Memo at 1). Pignard has submitted a sworn declaration with his moving papers averring that he resided in Apartment B2, thereby establishing his standing to contest the warrant and the search directed at those premises. (Pignard Affidavit dated 11/14/06). Defendant also asks the Court to direct the Government to provide the defense with certain Brady material and a bill of particulars. (D. Memo at 1).

The Government opposes defendant's motions.

<u>Pignard's Arrest</u>

On August 24, 2006, agents from the Federal Bureau of Investigation ("FBI"), assisted by the Orangetown and Piermont Police Departments, arrested Hurgenes Pignard, pursuant to a federal arrest warrant, in connection with the bank robbery and weapon charges that are before the court. Pignard does not claim any infirmity with the federal arrest warrant or the legality of his arrest.

<u>Search Warrant Application</u>

After Pignard was arrested, Piermont Police Detective Brian Holihan applied to the Village of Piermont Justice Court for a warrant to search defendant's apartment. Holihan sought permission to search for cocaine, United States currency and financial records representing proceeds of drug trafficking, drug records, drug paraphernalia and documents evidencing residency at the premises. (Warrant Application at ¶10). In support of this request, Holihan alleged that on the morning of Pignards arrest, he and Piermont Police Officer John Dowd – along with members of an FBI Swat Team – were positioned outside Pignard's apartment, watching the east side of the building. According to Holihan's affidavit in support of the search warrant:

> While the arrest warrant was being executed, I observed Hurgens [sic] Pignard punch a hole through a closed screen of a second floor bedroom window in apartment B2, from inside. I observed an item fall from the second floor bedroom window. I observed Officer John Dowd recover the item that was thrown to the ground by

>Hurgenes Pignard, and I packaged the item in an evidence bag. I then observed Officer John Down take custody of this item, and give it to Police Officer Ken Marren of the Piermont Police Department. I was informed by Officer Marren that he conducted a NIK field test on the recovered item, at the Piermont Police Department. Officer Marren informed me that the recovered item tested positive for cocaine. I was informed that the cocaine was then placed into evidence at the Piermont Police Department.

(Holihan Search Warrant Aff. ¶ 5).

Holihan alleges further that, "once the area of apartment B2 was secure" he and other officers entered the apartment and secured it as "a crime scene." Inside he observed two other occupants of the apartment, the defendant's wife, Sonia Pignard ,and a relative, Edward Castro. Holihan stated that, while in the apartment he observed zip lock baggies [which] are commonly used to package and distribute narcotics and marihuana." (Holihan Search Warrant Aff. ¶ 6).

In addition to the indicia of drug trafficking in the apartment that was gleaned the day of the arrest, Holihan advised the magistrate that he and his fellow officers were aware that: (1) Pignard had a prior felony narcotics conviction for possessing over an eighth of cocaine; (2) Piganrd had previously admitted that he dealt cocaine to pay his bills; and (3) that a prior search of Pignard's residence had led to the seizure of a scale and packaging materials in his bedroom. (Holihan Search Warrant Aff. ¶ 8).

Piermont Justice Court Judge Laura Weiss signed the search warrant and a search ensued. It recovered: black neoprene masks; pair of latex gloves; hospital scrub shirt; hospital mask; NYPD baseball hat; tan shorts; 18 tin foil packets containing cocaine and 3 tin foil packets containing cocaine residue; plastic bag containing cocaine; yellow metal ring with compartment containing cocaine residue; metal tin box with drug equipment and two scales; red pocketbook containing numerous plastic bags; 45 metal rings on velcro strap in VHS box; assorted jewelry; United States

currency; personal papers; and a "Scarface" movie poster.

Holihan's Affidavit in Support of the Government's Opposition to Defendant's Motion

In an affidavit filed on January 18, 2007, with the Government's opposition papers, Holihan went into somewhat greater detail about how the officers came to observe the plastic baggies as they secured the apartment prior to the search.

Holihan states that he and other Piermont Police Department decided to obtain a search warrant before entering the apartment. The impetus for the application was the dropping of the glassine containing cocaine out of the apartment window. The local police officers did not enter Pignard's apartment until after the FBI had left. (See 1/18/07 Holihan Aff. ¶ 4). Upon entering the apartment, they proceeded to secure the apartment as a crime scene. They told Sonia Pignard and Castro that they were applying for a search warrant and that they (Sonia Pignard and Castro) would not be allowed to remain in the apartment, so that the officers could ensure that contraband was not destroyed or removed. The officers told Sonia Pignard and Castro that they could retrieve personal items that they would need while the search of the residence was taking place. (See 1/18/07 Holihan Aff. ¶ 5).

> Sonia Pignard and Castro told us that they wanted to obtain some items. I, and other officers, accompanied Sonia Pignard to the master bedroom on the second floor of the apartment. While in the bedroom, Sonia Pignard retrieved a red purse. I informed her, in sum and substance, that we needed to ensure that she would not be leaving the apartment with any contraband and would need to see what was inside her purse. I then asked her if she would open her purse so we could see what was inside. Sonia Pignard responded, in sum and substance, that it would not be a problem, that she had nothing to hide and that she was not involved in anything wrong. She then opened the purse and I saw a bunch of very small zip lock baggies inside the purse. I then asked her what the plastic baggies were for and she responded, in sum and substance, that she didn't need the purse and wasn't taking it with her. After Castro and Sonia Pignard gathered some items, they left the apartment. I then left the apartment to draft the search warrant affidavit. The other officers then left the apartment and waited outside the apartment in the parking lot,

on the stairs and in the common hallway.

Sonia Pignard has not put in an affidavit contesting any of Officer Holihan's statements. In particular, she did not contest his statement that he asked permission to search the red purse and was given permission to do so.

### Legal Standard for obtaining a Search Warrant

The Fourth Amendment provides that search warrants shall not be issued, except "upon probable cause, supported by Oath or affirmation." U.S. Const. amend. IV. The legal standard for determining whether a particular search warrant application is supported by probable cause is well established. "The task of the issuing magistrate is simply to make a practical, common-sense decision whether given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983) (emphasis added). Such determinations must be approached in a practical way, id. at 232, because "probable cause is a flexible common-sense standard," Texas v. Brown, 460 U.S. 730, 742 (1983). "The process does not deal with hard certainties, but with probabilities. . . . [T]he evidence . . . must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." Illinois v. Gates, 462 U.S. at 231-32 (quoting United States v. Cortez, 449 U.S. 411, 418 (1981)).

The duty of a court reviewing a lower court's probable cause determination is "simply to ensure that the magistrate had a substantial basis for . . . conclud[ing] that probable cause existed." Gates, 462 U.S. at 238-39 (internal quotations omitted); see United States v. Rosa, 11 F.3d 315, 326 (2d Cir. 1993); United States v. Smith, 9 F.3d 1007, 1012 (2d Cir. 1993); Rivera v. United States, 928 F.2d 592, 602 (2d Cir. 1991). "A search warrant issued by a neutral and detached magistrate is

5

entitled to substantial deference, and 'doubts should be resolved in favor of upholding the warrant.' " Rosa, 11 F.3d at 326 (quoting United States v. Travisano, 724 F.2d 341, 345 (2d Cir. 1983)); see Gates, 462 U.S. at 236; Smith, 9 F.3d at 1012. Indeed, "the magistrate's finding of probable cause is itself a substantial factor tending to uphold the validity of [the] warrant." Travisano, 724 F.2d at 345; accord United States v. Jackstadt, 617 F.2d 12, 13 (2d Cir. 1980).

Judge Weiss Had Probable Cause to Issue the Warrant

In the present case, Pignard argues that "Holihan's warrant application fails to establish probable cause to believe that there was evidence of drug dealing in defendant's apartment." (D. Memo at 7). I disagree.

Judge Weiss was presented with information that gave rise to probable cause. Pignard was observed by Piermont police officers dropping a glassine envelope containing cocaine out of a bedroom window (which he smashed in order to get access to the outside) as the FBI were entering his home to arrest him. Defendant was a known drug dealer: Judge Weiss was told that: (1) Pignard had a prior felony narcotics conviction for possessing over an eighth of cocaine; (2) Piganrd had previously admitted that he dealt cocaine to pay his bills; and (3) that a prior search of Pignard's residence had led to the seizure of a scale and packaging materials in his bedroom. (Holihan Search Warrant Aff. ¶ 8)..

Given that evidence of a crime – a bag of cocaine – was dropped out of the residence, there was certainly a "fair probability that contraband or evidence of a crime will be found in [that] particular place." Gates, 462 U.S. at 238 (1983) (emphasis added). And the Second Circuit has held that a prior conviction for the same type of narcotics offense under investigation is a "relevant consideration in determining probable cause. See United States v. Wagner, 989 F.2d 69, 73 (2d Cir.

1993); United States v. Rowell, 903 F.2d 899, 903 (2d Cir. 1990).

Defendant cites to United States v. Gamble, 384 F.3d 74, 77 (2d Cir. 2004), for the proposition that a small amount of drugs without more, is insufficient to demonstrate that a defendant intended to distribute drugs, (see Green Br. at 7). But in Gamble, the Court of Appeals, citing United States v. Boissoneault, 926 F.2d 230, 234 (2d Cir.1991), held only that a small amount of drugs, with nothing more, presented a jury with sufficient evidence for a jury to find beyond a reasonable doubt that the defendant possessed cocaine base with the intent to distribute. The threshold for issuing a search warrant is far lower, and turns on whether "there is a fair probability that contraband or evidence of a crime will be found in a particular place." Gates, 462 U.S. at 238 (emphasis added). When a person with a known history of dealing drugs smashes a bedroom window and throws even a small amount of drugs out the window, there is a fair probability that evidence of a crime will be found in that particular place. The warrant would be sustained as valid if that were the only information contained in the application.

However, the affidavit contained additional information. Detective Holihan told Judge Weiss that he had observed "zip lock baggies [which are] commonly used to package and distribute narcotics and marihuana" in the apartment. Holihan Search Warrant Aff. ¶ 6). Judge Laura Weiss – in making her probable cause finding – was entitled to rely on the expert opinion of Detective Holihan, based upon his law enforcement expertise, that the possession of a bag of cocaine along with the possession of zip lock baggies was "consistent with an ongoing narcotics trafficking operation." See United States v. Percan, 1999 WL 13040, at *4 (S.D.N.Y. Jan. 13, 1999) (citing United States v. Fama, 758 F.2d 834, 838 (2d Cir. 1985)). Further, courts in this Circuit have consistently ruled that it is proper for a judge to find probable cause to search a residence where

7

there is evidence of narcotics trafficking and a law enforcement officer has opined that narcotics traffickers keep evidence of their illicit activities at their residence. See United States v. Cruz, 785 F.2d 399, 405- 406 (2d Cir. 1986).

Thus, "applying the common sense, totality-of-the-circumstances test set forth in Gates," Wagner, 989 F.2d at 73, it was reasonable for Judge Weiss to conclude that probable cause existed for the issuance of the search warrant for Pignard's residence.

Defendant attempts to undermine the validity of the warrant by arguing that the officers had no right to conduct the activities that led them to see the glassine baggies– securing the apartment after defendant's arrest and searching Sonia Pignard's red purse. He is misguided.

The validity of a warrant depends on the existence of probable cause, and the issue is what the neutral magistrate was told. See United States v. Singh, 390 F.3d 168, 181 (2d Cir. 2004). Here everything Judge Weiss was told, individually and taken together, pointed to the fair probability that the apartment would contain evidence of a crime. Of course, a warrant predicated on intentionally false information or information provide with reckless disregard for the truth may prove defective. see Franks v. Delaware, 438 U.S. 154, 164-72 (1978). However, there is no suggestion here that Detective Holihan provided Judge Weiss with any false information. What defendant suggests is that the officers illegally obtained information that was true. That does not affect the validity of the warrant.

Furthermore, I cannot conclude that any of the information relayed to Judge Weiss was illegally obtained. Defendant does not suggest that the officers' observation of him breaking the window and throwing out the evidence was illegal, nor is there any suggestion that information about his prior record and past drug dealing was obtained illegally. I have already ruled that the

warrant was sufficiently supported by probable cause based solely on that information.

The officers did nothing wrong by entering and securing the apartment while waiting for the warrant to issue. In Segura v. United States, 468 U.S. 796 (1984), the Supreme Court held that "securing a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while a search warrant is being sought is not itself an unreasonable seizure of either the dwelling or its contents." Id. at 810; United States v. Ruiz-Estrada, 312 F.3d 398, 404 (8th Cir. 2002).

And I know of no rule of law – certainly defendant cites none – that would prevent the officers from asking persons like Sonia Pignard and Castro to leave an area that was being secured as a crime scene. It is well-settled that officers securing a dwelling as a crime scene are permitted to bar individuals from entering in a residence while obtaining a warrant, see Illinois v. McArthur, 531 U.S. 326 (2001). It is also well-settled that they can detain persons at a crime scene while waiting for a warrant or conducting a search, even if those persons are not otherwise suspected of committing crimes. Ayeni v. Mottola, 35 F.3d 680, 690 n.13 (2d Cir. 1994) (recognizing that the rationale of Segura "would permit minimal restraint upon bystander occupants of premises to prevent them from destroying evidence or otherwise interfering with a search"). So it goes without saying that the officers had the right to tell Castro and Sonia Pignard to leave the scene until a search could be conducted.

The only question is whether the officers has the legal right to look through any personal effects that Sonia Pignard and Castro took with them when the left the house, in order to ensure that evidence was not being removed from the scene. The parties have not cited to any case directly on point, and the court has found none. However, it stands to reason that, if the police could restrain the liberty of Sonia Pignard until the search warrant was obtained and the search conducted, they

9

could condition her removal of personal effects from the apartment on her permitting them to look through them. Moreover, Sonia Pignard has not disputed Officer Holihan's sworn statement that she consented to a search of her red purse. Therefore, I fail to see why the officers' observation of the contents of her purse was illegal.

<u>Individual Items Need Not Be Suppressed as Being Beyond the Scope of the Warrant</u>

Pignard also claims that a number of the items should be suppressed because their seizure was not specifically authorized by the search warrant.

The warrant authorized the search for cocaine, United States currency and financial records representing proceeds of drug trafficking, drug records, financial records, drug paraphernalia and documents evidencing residency at the apartment.

The Government represents that it has no present intention of offering in evidence the various items of jewelry or the "Scarface" picture seized during the search. (G. Memo at 6 n.2). However, the Government will apparently seek to introduce at trial: the pair of tan shorts found in the bedroom with 18 tins containing cocaine and 3 tins with cocaine residue in the pockets; black neoprene masks; pair of latex gloves; hospital scrub shirt and hospital mask; and (4) NYPD baseball hat. (G. Memo at 7).

Agents executing a search warrant are not confined to collecting items specifically enumerated in the search warrant, but also may seize items whose evidentiary value is immediately apparent to the agents. In <u>Coolidge</u> v. <u>New Hampshire</u>, the Supreme Court held that when the police have a valid warrant "to search a given area for specified objects, and in the course of the search come across some other article of incriminating character," they may seize it if it is "immediately apparent to the police that they have evidence before them . . . ." 403 U.S. 443, 465-66 (1971); <u>see</u>

Minnesota v. Dickerson, 508 U.S. 366, 374- 76, (1993); Horton v. California, 496 U.S. 128, 134-37 (1990).

Detective Holihan's affidavit makes clear that the law enforcement officers were well aware of the evidentiary nature of the: (1) black neoprene masks; (2) pair of latex gloves; (3) "hospital scrub shirt" and "hospital mask"; and (4) "NYPD baseball hat." Prior to the arrest of Pignard and the subsequent search of his residence, Orangetown Police Department detectives had advised the Piermont Police Department that they had learned that Pignard had been involved in several robberies in Sullivan and Rockland counties including a robbery of the Palisades Federal Credit Union during which the robbers were dressed in medical attire and the robbery/kidnaping of a check cashing store employee whose kidnaping was effectuated by masked individuals wearing NYPD insignia items. Because the Piermont Police Department had probable cause to associate these items with criminal activity, the items were properly seized.

The tan shorts were properly seized because it is from those shorts where the officers allegedly found the 18 packets of cocaine and 3 packets with cocaine residue.

Good Faith Exception

Finally, the Government argues that the good faith exception to the exclusionary rule would prevent suppression in this case.

It is not necessary to reach this issue because I have upheld the validity of the warrant. However, one could not find bad faith on the part of the police in this case.

The Supreme Court has held that the exclusionary rule and its harsh remedy of suppression should not apply where evidence is "obtained in objectively reasonable reliance on a subsequently invalidated search warrant." United States v. Leon, 468 U.S. 897, 922 (1984). "The essential

11

rationale underlying [this] good faith exception is that the exclusionary rule 'cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity.' " United States v. Cancelmo, 64 F.3d 804, 807 (2d Cir. 1995) (quoting Leon, 468 U.S. at 919); see also Arizona v. Evans, 514 U.S. 1, 10 (1995). The pivotal question in a particular case is thus "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." Leon, 468 U.S. at 922 n.23; see also United States v. Moore, 968 F.2d 216, 222 (2d Cir. 1992). If the reviewing court finds that the officers' reliance on the warrant was objectively reasonable, suppression is not warranted. See e.g., United States v. Roberts, 852 F.2d 671, 675 (2d Cir. 1988).

The only instances where the good faith exception does not apply are where: (1) the magistrate was misled by information the affiant knew was false; (2) the magistrate wholly abandoned her judicial rule; (3) the supporting affidavit lacked any indicia of probable cause; or (4) the warrant was insufficiently specific. Leon, 468 U.S. at 923. None of those conditions is present here. In this case, the magistrate was not given any *false* information – no one contests (at least for the purposes of this motion) that the defendant broke a window that threw drugs out, or that Pignard had a history as a drug dealer, or that the officers actually saw baggies that they recognized as connected to drug dealing. Nor has defendant suggested that Judge Weiss wholly abandoned her judicial role. The court has already ruled that the supporting affidavit contained indicia of probable cause. Finally, the warrant was sufficiently specific.

Again, defendant is reduced to arguing that the police had no right to look inside Sonia Pignard's purse, where they found the baggies, asserting, "From our review of the post-search warrant inventory, the initial observation of the baggies appears to have been made by unlawfully

opening a woman's purse in the home before a warrant was obtained," (Green Br. 8). I have already concluded that Officer Holihan did nothing wrong in asking Mrs. Pignard to open her purse before taking it out of the house, and that Mrs. Pignard did so voluntarily. However, even if it were unlawful for the officer to ask Mrs. Pgnard to open her purse, that would not affect the applicability of the "good faith" exception, because the application for a search warrant contained sufficient probable cause without reference to the contents of Sonia Pignard's purse. Indeed, the officers had concluded that they should apply for a warrant before they entered the house or permitted Sonia Pignard to retrieve her purse. They made that decision when they saw defendant dispose of evidence out of a second story window. That alone was sufficient to support a finding of probable cause by a neutral magistrate. Disposing of evidence in the sight of police officers coupled with information about the defendant's history as a drug dealer was more than sufficient to support a finding of probable cause by Judge Weiss. So assuming that the judge was "misled" by the officers' silence about how the found the glassines (which, of course, does not make their statement that glassines were found in the apartment untrue – just incomplete), there is so much probable cause to support the affidavit that this particular omission would constitute harmless error for purposes of the good faith exception.

### Ultimate Admissibility of Seized Evidence

Aside from the suppression issue (now decided against him), defendant raises a perfectly proper question: Why is evidence of the uncharged narcotics crimes relevant to this case, which is a bank robbery case?

The defense argues that the evidence of narcotics possession and distribution and other uncharged crimes is 404(b) evidence that should be excluded on relevance grounds and because its

prejudicial affect would outweigh its probative value.  By letter dated November 1, 2006, defendant demanded that the Government inform the defense "whether the Government intends to offer any evidence pursuant to 404(b)."  According to defendant, the Government has not responded to that demand.

Now that the suppression motion has been decided and the matter will be scheduled for trial, the Government is directed to inform the defense and the Court of its intentions vis-a-vis the narcotics and other uncharged crimes evidence.  This will allow the court to make its 404(b) rulings in due course. Nothing in this opinion should be read as constituting a final ruling on the admissibility of the evidence of narcotics dealing. The evidence that relates to the bank robberies, however, is admissible.

<u>Discovery Motions</u>

Pignard asks the Court to order the Government to provide him a bill of particulars because it is "necessary to the defense to understand what criminal conduct he is alleged to have committed." (D. Memo at 17).  Specifically, defendant asks for a bill of particulars that includes "the identities of his alleged co-conspirators and a description of the role each had in the charged offenses, the address where the overt act alleged to have taken place on April 20, 2005, [] (the indictment describes it as Divine Corners Road without further information, and particulars on any statements alleged to have been uttered by defendant in the course of the charged crimes." (D. Br. at 17).

A bill of particulars is required only where the indictment is so general that it does not advise the defendant of the specific acts of which he is accused.  <u>United States</u> v. <u>Torres</u>, 901 F.2d 205, 234 (2d Cir. 1990) (citations omitted); <u>United States</u> v. <u>Gibson</u>, 2001 WL 460935, at *3 (S.D.N.Y. May 1, 2001) ("[A] bill of particulars is not a matter of right.").  A motion for a bill of particulars should

be granted <u>only</u> where necessary (1) to inform the accused of the charge against him with sufficient precision to enable him to prepare his defense and avoid surprise; and (2) to enable the accused to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense. See <u>Wong Tai</u> v. <u>United States</u>, 273 U.S. 77, 82 (1927); <u>United States</u> v. <u>Bortnovsky</u>, 820 F.2d 572, 574 (2d Cir. 1987). If the information sought by a defendant is provided in the indictment or through some other means, a bill of particulars is not necessary. See <u>Bortnovsky</u>, 820 F.2d at 574.

Pignard's request appears to be asking for a "road map" of the Government's proof, which is not the function of a bill of particulars. <u>United States</u> v. <u>Taylor</u>, 707 F. Supp. 696, 699 (S.D.N.Y. 1989) (citations omitted); <u>United States</u> v. <u>Persico</u>, 621 F. Supp. 842, 868 (S.D.N.Y. 1985). However, to the extent defendant is looking for clarification of the overt acts (they are curiously vague), unless that information has been provided through some other means, the Government is directed to particularize that information. The Government will, of course, be given an opportunity at the next conference to make a record of the discovery it has already provided to the defense – it has not done so in its opposition papers – and to argue that that discovery, read in conjunction with the indictment, has provided defendant with adequate notice of the precise nature of the charges against him, to enable him to prepare his defense, avoid unfair surprise at trial, and preclude a second prosecution for the same offense.

Based on the Government's representation that it is aware of its obligations under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and its progeny, and that the Government will continue to provide such information to the defendant in a timely fashion (G. Memo at 10), this Court will not issue an order compelling the production of such materials at this time. See, e.g., <u>United States v. Gallo</u>, 1999 WL 9848, at *7 (S.D.N.Y. January 6, 1999); <u>United States v. Perez</u>, 940 F. Supp. 540, 543

order compelling the production of such materials at this time. See, e.g., United States v. Gallo, 1999 WL 9848, at *7 (S.D.N.Y. January 6, 1999); United States v. Perez, 940 F. Supp. 540, 543 (S.D.N.Y. 1996). The Government is reminded of this Court's views concerning the seriousness of its Brady obligations. United States v. St. Germain, 2004 WL 1171403, S.D.N.Y., May 11, 2004.

The Government's motion for reciprocal discover pursuant to Fed R. Crim. P. 16 (b) (1) (A) & (B), is granted.

Any *in limine* motions are to be filed at least two weeks prior to trial.

This constitutes the decision and order of the Court.

February 2, 2007

_____
U.S.D.J.

BY HAND TO:

John P. Collins, Jr.
Assistant United States Attorney

Theodore S. Green
200 Mamaroneck Avenue
White Plains, NY 10601