

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*United States Courthouse*
*300 Quarropas Street*
*New York, New York 10601*

September 28, 2007

The Honorable Colleen McMahon
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10/10/07
```

Re:  **United States v. Hurgenes Pignard**
     **S 06 Cr. 718 (CM)**

Dear Judge McMahon:

The Government respectfully submits this letter brief in support of its argument that the robbery of RIA Financial Services ("RIA") and the attempted bank robbery of the Charter One Bank be included in the offense level computation for Pignard's sentence.

**I.   Applicable Law**

Section 1B1.3(a) of the Sentencing Guidelines provides that, in determining a defendant's base offense level, the District Court must consider all "relevant conduct," which is defined as: "all acts and omissions committed . . . or willfully caused by the defendant . . . that occurred during the commission of the offense of conviction, or in the course of attempting to avoid detection or responsibility for that offense." U.S.S.G. § 1B1.3.(a)(1); with respect to offenses for which loss amounts or other quantities can be aggregated, "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction"; U.S.S.G. § 1B1.3(a)(2); and "all harm that resulted from the [defendant's] acts and omissions . . ." U.S.S.G. § 1B1.3.(a)(3).

Section 1B1.3 directs sentencing courts to consider "the entire range of conduct, regardless of the number of counts that are alleged or on which a conviction is obtained." U.S.S.G. § 1B1.3, comment. (backg'd). Even "[c]onduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range." Id.

The Court of Appeals has recognized that the relevant conduct provisions contained in Section 1B1.3(a)(2) are to be determined "broadly" to include: conduct for which the defendant

The Honorable Colleen McMahon
September 28, 2007
Page 2

was acquitted; conduct related to dismissed counts of an indictment; conduct that predates that charged in the indictment; conduct not charged in the indictment; and conduct outside the statute of limitations. See United States v. Silkowsky, 32 F.3d 682, 688 (2d Cir. 1994) (citations omitted); see also United States v. Sisti, 91 F.3d 305, 312 (2d Cir. 1996) (a court is free to consider dropped counts of an indictment and criminal activity resulting in acquittal in determining sentence); United States v. Reese, 33 F.3d 166, 174 (2d Cir. 1994)) (same); United States v. Concepcion, 983 F.2d 369, 387 (2d Cir. 1992) (same).

Disputed facts relevant to sentencing determinations under the Guidelines need only be proved by a preponderance of the evidence. See United States v. Garcia, 413 F.3d 201, 220 n.15 (2d Cir. 2005).

## II.    Discussion

The evidence clearly showed that Pignard, acting as a member of the robbery crew responsible for robberies across New York State, participated in the armed robbery of RIA – a Hobbs Act robbery – and the attempted armed robbery of Charter One Bank. As a result, his guidelines offense level should be 37 as set forth in the September 12, 2007 PSR. (9/12/07 PSR ¶ 95).

### A.    Robbery of RIA Financial Services

On December 12, 2004, using information gained from a driver who worked for the armored car company that services RIA – a check cashing establishment located in the Bronx, New York – Pignard, Regis, and Lindsay planned to rob RIA by holding an employee and her husband hostage. (Tr. 51-52). Lindsay testified that Pignard was specifically recruited for this robbery because all of the employees at the store spoke Spanish and neither Regis nor Lindsay spoke Spanish. (Tr. 51).

On the evening of the robbery, Pignard, Regis and Lindsay followed Jeocanda Regal and her husband home from RIA. (Tr. 52). When Regal and her husband arrived at their home, Pignard and Regis approached them with pellet guns and Pignard instructed them – in Spanish – to go inside the house. (Tr. 53-54). Inside the Regals' apartment, Pignard instructed Mrs. Regal that while Regis would be watching her husband, Pignard and Lindsay would be driving Regal back to RIA to get the money. (Tr. 54).

Thereafter, Pignard and Lindsay left the apartment with Mrs. Regal and went back to RIA. Lindsay drove while Pignard sat in the back with Mrs. Regal and told her – in Spanish – that everything would be fine. (Tr. 54). When they arrived at RIA, Lindsay and Regal got out the car and walked to the RIA store. Regal opened the store and Lindsay and Regal went inside. (Tr. 55). Inside the store, Regal opened the safe and gave Lindsay the money inside – approximately $53,000. (Tr. 55). After Regal locked up the store, they returned to the car. Lindsay got back in

The Honorable Colleen McMahon
September 28, 2007
Page 3

the driver's seat and Regal sat in the back with Pignard. (Tr. 56). Lindsay then drove back to the Regals' apartment.

When they arrived back at the Regals' apartment, Regis had already tied up Regal's husband. (Tr. 57). After Lindsay refused to tie up Mrs. Regal, Regis tied her up and placed both of them in the bedroom. (Tr. 57). Thereafter, the three robbers left the apartment, went to Pignard's residence in Rockland County and split up the money taken from RIA. (Tr. 57-58).

Much of Lindsay's testimony was corroborated by Mrs. Regal's testimony and the physical evidence recovered at the apartment. (Tr. 324-42). Mrs. Regal testified that RIA used Rapid Armored Car Service – the same armored car company that employed Mark Hall, who provided Regis with the information about RIA. (Tr. 324). Mrs. Regal also testified that one of the robbers that night spoke in Spanish using phrases such as: "Sera cosa bien" – Do things right; "Mater Esposo" – "Kill husband"; "mano en lo caro" -- hand on face; and "Sera cosa bien, regresso por te" – Do things right or we will come back for you. Just as Lindsay had testified, Mrs. Regal recounted that her husband was held prisoner by one of the robbers while she was taken back to RIA and forced to empty out the safe in RIA's office.

In addition, the physical evidence corroborated Lindsay's testimony. Among the exhibits admitted at trial were the air gun that had been recovered from the Regals' apartment, GX 102, and Pignard's flyer from his home in which he advertised that he was fluent in Spanish. GX 500. Because all of the evidence showed by far more than a preponderance of the evidence that Pignard robbed RIA on the night of December 12, 2004 and that this robbery was part of the robbery crew's scheme to rob financial institutions throughout New York State, this robbery must be part of the relevant conduct for Pignard's sentencing.*

B.   Attempted Robbery of Charter One Bank

On February 3, 2005, Pignard, Regis, Daly and Lindsay attempted to rob the Charter One Bank in Spring Valley, New York. Their plan was to hold one of the managers hostage that night and then take the manager to the bank the next morning to rob the bank. That night, the four robbers followed Reda Youssef home from the Charter One Bank. (Tr. 63). When Youssef arrived home, Pignard, Regis and Lindsay approached Youssef's car. Regis then banged on Youssef's car with a real gun. (Tr. 66).

At gunpoint, Youssef led Pignard, Regis and Lindsay to his landlord's apartment. (Tr. 67). When the landlord opened the door, Lindsay rushed in and chased after her until he encountered her fiancé – Quincy Lee – in their bedroom. (Tr. 67). During a violent and bloody

---

\*   Consistent with the September 12, 2007 PSR, the adjusted offense level for the RIA robbery should be 29. (See 9/12/07 PSR ¶¶ 60-67).

3

The Honorable Colleen McMahon
September 26, 2007
Page 4

struggle that would leave Lee with a broken finger and gashes in his head, Lindsay, Pignard and Regis beat Lee in the apartment. (Tr. 68). Realizing that they had left Youssef and his landlord unattended, the three robbers fled back to the car. (Tr. 68-69). Then, Daly drove them back to Pignard's house where Regis and Lindsay changed out of their bloody clothes.

It is clear from their testimony that both Lindsay and Daly were present in Pignard's apartment in Rockland County. Both Lindsay and Daly testified accurately about the contents of Pignard's apartment. Their description of Pignard's apartment was corroborated not only by Detective Holihan's testimony but also by the photographs of the apartment admitted in evidence. All of the evidence showed by far more than a preponderance of the evidence that Pignard attempted to rob the Charter One Bank in Spring Valley on the night of February 3, 2005."

## CONCLUSION

The offense conduct sections of the PSR should be amended to reflect Pignard's involvement in the RIA robbery and the Charter One attempted bank robbery, and his guidelines offense level should be 37 as set forth in the September 12, 2007 PSR. (9/12/07 PSR ¶ 95).

Respectfully submitted,

MICHAEL J. GARCIA
United States Attorney

By: _____

JOHN P. COLLINS, JR
Assistant United States Attorney
(914) 993-1919

cc:  William Gerard, Esq. (by facsimile)

---

** Consistent with the September 12, 2007 PSR, the adjusted offense level for the attempted Charter One bank robbery should be 34. (See 9/12/07 PSR ¶¶ 51-59).